IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
May 29, 2019 Session

## STATE OF TENNESSEE v. SEAN ANGELO DAVENPORT

**Appeal from the Criminal Court for Bradley County**
**No. 16-CR-261      Sandra Donaghy, Judge**

_____

**No. E2018-01273-CCA-R3-CD**

_____

A jury convicted Defendant, Sean Angelo Davenport, of first degree premeditated murder, and Defendant was sentenced to life.  On appeal, Defendant argues that (1) the evidence was insufficient for a rational juror to have found him guilty of first degree premeditated murder; (2) the trial court erred by instructing the jury on flight; (3) the trial court erred by failing to give Defendant's requested jury instruction on spoliation; (4) the trial court erred by admitting evidence of Defendant's prior bad acts; and (5) the trial court erred by failing to order a mistrial when, during deliberations, the jury asked if Defendant had access to their personal information.  After a thorough review of the facts and applicable case law, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT W. WEDEMEYER, J., joined.

Charles P. Dupree, Chattanooga, Tennessee, (on appeal) and Kenneth Miller, Cleveland, Tennessee, (at trial) for the appellant, Sean Angelo Davenport.

Herbert H. Slatery III, Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Stephen D. Crump, District Attorney General; and Krista Oswalt and Heather Miller, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

On July 13, 2016, the Bradley County Grand Jury indicted Defendant for first degree premeditated murder in the death of the victim, Michael Shane Swafford.

### *Rule 404(b) hearing*

After the jury was selected and opening statements were completed, the trial court held a 404(b) hearing outside the presence of the jury to determine if McKala Sednek would be permitted to testify regarding Defendant's behavior on the days preceding and the moments directly following the killing of the victim on April 14, 2015. Ms. Sednek and Defendant lived together for three years prior to the homicide, and she was the mother of one of Defendant's children. Ms. Sednek testified that, a few days before the homicide, Defendant vandalized her car and that on April 12, 2015, Defendant held a gun to her head during an argument. The trial court found

> that a material issue exists that is the complete story of the crime, the Defendant's intent, and the victim's state of mind, that those are information that the [j]ury needs to hear in rendering the decision that they do, that it does not go to character trait for violence by the Defendant; that this proof is by clear and convincing evidence, and it should not be excluded as the danger of unfair prejudice does not outweigh the probative value of this evidence.

Ms. Sednek also testified that she and Defendant lost custody of their child because she failed a drug test and Defendant refused to submit one to the Department of Children's Services ("DCS"). The trial court found it permissible for the State to question Ms. Sednek about Defendant's refusal to take a drug test because trial counsel opened the door by mentioning Ms. Sednek's drug problems during opening statement.

### *Jury trial*

After stating her name, Ms. Sednek, who was handcuffed during her testimony, stated that she was being held on charges of aggravated child neglect, aggravated burglary, forgery, and theft of property. Ms. Sednek admitted that she had been previously convicted of possession of marijuana one time and shoplifting three times. She said she had a drug problem and that she was using methamphetamine in 2015.

Ms. Sednek said that she and Defendant had been living at a leased residence for three years and that the victim had been living with them for about a week prior to April 14, 2015. On Saturday, April 12, Defendant and Ms. Sednek had a heated argument, and Defendant demanded that the victim leave. The argument escalated after the victim left. At one point during the argument, Defendant held a gun to Ms. Sednek's left temple. Defendant left the residence after the argument subsided, and Ms. Sednek called her father, who at some point called the police. Defendant then returned to the residence.

On the morning of April 13, a police officer came to the residence, but Ms. Sednek told him nothing happened. She testified that she lied to the officer on April 13 because she was scared of Defendant. On the same day, an officer returned to the residence because Ms. Sednek reported that her Xanax and hydrocodone had been stolen. Defendant left the residence before the police arrived. The victim returned to the residence after the police left, and Ms. Sednek invited the victim back into the house. Ms. Sednek stated that she believed she told the victim about her argument with Defendant before she went to sleep that evening.

When Ms. Sednek awoke on April 14, 2015, Defendant was at the residence. When the victim discovered that Defendant had returned, he came out of the bedroom into the living room yelling at Defendant, and he began hitting Defendant. Ms. Sednek claimed that the fight between Defendant and the victim lasted a few minutes. She did not see either Defendant or the victim with a firearm during this altercation. She said that she had never seen the victim with a firearm.

Ms. Sednek testified that, once the physical altercation ended, Defendant went outside, and the victim went to his bedroom. The victim returned to the living room with his shoes and sat down on the couch. Ms. Sednek said that she heard Defendant run onto the porch, and then Defendant opened the front door, stepped inside, and shot the victim multiple times as he was sitting on the couch and leaning over tying his shoes. Defendant then ran out of the house but stopped, turned around, pointed his gun at Ms. Sednek, and said, "Twenty-five to life." Defendant got in his truck and drove away. Ms. Sednek said that she had seen Defendant with the pistol used to kill the victim before. She said that Defendant either wore it on his side or kept it under the bed.

Ms. Sednek called 911 and told the operator she "woke up to gunshots, and there is a guy that's been shot inside my house and that I didn't know who shot him." Ms. Sednek stated that she initially lied to police because she was in shock but later admitted to detectives that she saw Defendant shoot the victim. She denied having told anyone that the victim had a gun during the altercation.

Ms. Sednek said that she and Defendant had a son together but that they lost custody of their son because they both were addicted to drugs. Ms. Sednek stated that her relationship with Defendant was volatile. In the week prior to the homicide, she said Defendant slashed all four of her vehicle's tires and threw a brick through the windshield.

Officer Anthony Cochran of the Cleveland Police Department ("CPD") testified that, when he arrived at the scene of the homicide, he observed Ms. Sednek crying and pointing to the back door of the residence. He tried to speak with Ms. Sednek, but he could not understand her because she was hysterical. Officer Cochran performed a walk-through of the scene where he observed the victim in the corner facedown. After determining that there was no one else in the house, he signaled for Emergency Medical Services to go in the residence.

CPD Detective Andy Wattenbarger testified that he took photographs of the scene and collected physical evidence, including shell casings. Detective Wattenbarger also attended the victim's autopsy. Detective Wattenbarger observed five entry wounds and witnessed the medical examiner remove three bullets from the victim's body, which he collected and placed in a vault at the CPD to be processed by the Tennessee Bureau of Investigation ("TBI"). The following day, Ms. Sednek called and reported that she had found a shell casing in the couch. Detective Wattenbarger returned to the scene and retrieved the shell casing. During redirect examination, Detective Wattenbarger testified that the blood droplets discovered at the homicide scene indicated that the victim was sitting when he was shot.

CPD Detective Daniel Gibbs testified that he interviewed Ms. Sednek at the police department. Although Ms. Sednek originally claimed she did not see who shot the victim, she ultimately admitted that she saw Defendant shoot the victim. Detective Gibbs requested testing for DNA rather than fingerprints on the firearms. He stated that the TBI lab could not perform both tests because the methods used in DNA and fingerprint testing affected the results of the other test. Detective Gibbs chose the DNA testing because it was the "newer" technology.

Deputy Cheryl Holloway of the Bradley County Sheriff's Office ("BCSO") testified that she was driving on the APD-40 highway when she got off at the Blue Springs exit and noticed a wrecked car to her left in the grass. Deputy Holloway went to assist with this wreck and found Defendant standing outside of the driver's door. Defendant had an injury above his right eye, which he claimed he received during the wreck.

Officer Steven Warner of the CPD testified that he arrived at the scene of Defendant's wreck after Deputy Holloway. Officer Warner believed that Defendant had

tried to flee from the scene of the wreck because of the tire tracks in mud around Defendant's vehicle. Officer Warner looked into the open driver's door of Defendant's vehicle and saw the handle of a firearm sticking up from between the passenger seat and center console.

CPD Detective Cody Hinson testified that he assisted in the investigation of Defendant's wreck, took pictures of the scene, and prepared the vehicle to be towed to the police department. Detective Hinson took custody of a revolver and some ammunition from CPD Detective Laura Lane and later transported that evidence to CPD and delivered it to Detective Wattenbarger. After Detective Hinson obtained a search warrant for Defendant's vehicle, he and Detective Wattenbarger searched the vehicle and found various household items, clothing, bedding, a television, and a .380 pistol. In addition to the items found during the search, Detective Wattenbarger testified that a .38 caliber pistol and a box of .380 rounds had been removed from the vehicle at the scene of the accident.

Detective Laura Lane from the BCSO testified that she assisted Detective Hinson in the investigation of Defendant's wreck. Detective Lane photographed the scene and collected a revolver loaded with five live rounds, as well as a box of ammunition from the front seat of the vehicle, and placed the items in evidence bags. Detective Lane turned over custody of the items to Detective Hinson at the scene.

Special Agent Jessica Hudson testified that she was employed as a forensic scientist with the TBI. Agent Hudson worked specifically in the Firearm and Tool Mark Identification Unit and conducted a microscopic examination of the cartridge casings and firearms collected from the scene of the homicide. Based on her examination, Agent Hudson concluded that the cartridge casings were fired from the .380 pistol recovered from Defendant's vehicle. Agent Hudson also performed tests on the bullets recovered from the victim's body, but these tests were inconclusive.

Dr. Steven Cogswell, the Deputy Chief Medical Examiner for Hamilton County, testified that he performed the autopsy on the victim. Dr. Cogswell stated that the victim's cause of death was multiple gunshot wounds. One shot came from a downward angle in the left shoulder at an intermediate range. Another bullet came from a horizontal angle, which entered the victim's body past the mid-line on the victim's side at an undetermined range. Another gunshot wound entered on the left side of the victim's chest wall at an undetermined range. Another shot entered at the belt line from an undetermined range and exited through the buttocks. Dr. Cogswell concluded that the victim was sitting down at the time he was shot because of the abrasions surrounding the exit wound of the fourth bullet. Dr. Cogswell concluded that the victim's manner of death was homicide. During cross-examination, Dr. Cogswell ruled out the possibility

that the victim was bending over facing the shooter when he was shot due to the angles of the entry wounds. Dr. Cogswell testified that he did not observe any injuries on the victim's hands.

James Ervin, Defendant's and Ms. Sednek's neighbor, testified that he heard two gunshots while sitting on his front porch on the morning of April 14, 2015. Mr. Ervin said that he saw Ms. Sednek walk down the street in a northerly direction but that he never saw her return to her residence. During cross-examination, Mr. Ervin testified that he did not see any cars leave the driveway following the sound of gunshots.

Dean Deleon testified that he and Defendant were housed in the same pod at a Tennessee Department of Correction facility from July 2016 to August 2016. Mr. Deleon testified that Ms. Sednek previously spoke with him about the events of April 14, 2015, and Ms. Sednek specifically mentioned that both Defendant and the victim had guns at the time of the altercation. Mr. Deleon stated that he never told law enforcement about Ms. Sednek's statement. During redirect examination, Mr. Deleon denied that Defendant forced Mr. Deleon to testify about his conversation with Ms. Sednek.

Defendant testified that he and Ms. Sednek lost custody of their son in March 2014, due to drug exposure from both parents and because Defendant refused to provide DCS with a drug test. He said that he refused to take the test because he had a prescription drug problem at the time. Defendant admitted to vandalizing Ms. Sednek's car the week prior to April 14, 2015, by throwing a brick through her windshield and slashing her tires. Defendant claimed that he wanted to prevent Ms. Sednek from trading her car for methamphetamine.

Defendant said that he allowed the victim to stay with him as a favor to the victim's brother. The victim lived with Defendant and Ms. Sednek for about a week before Defendant asked the victim to leave the residence because Defendant and Ms. Sednek were arguing over Ms. Sednek's drug addiction. The victim left the residence when asked.

The following day, Defendant also left the residence because Ms. Sednek called the police to the residence after Defendant held a gun to her head. Defendant returned to the residence the morning of April 14, 2015. Defendant stated that he did not know that the victim was at the residence at the time. When Defendant entered the residence, the victim began hitting him with his fists. Defendant claimed that he dropped a .38 caliber pistol that was secured to his waist during the attack, and he feared the victim would get the pistol. Defendant ran to his car to retrieve a .380 pistol. Defendant testified that he was so angry from fighting with the victim that he did not have time to think about what he was doing when he got his gun.

- 6 -

Defendant testified that, when he came back into the house, the victim was standing facing away from him and that the victim "spun around" holding the .38 caliber pistol. Defendant stated that he shot the victim in self-defense; the victim did not drop the firearm immediately, so Defendant continued to shoot the victim until the victim dropped the firearm. Defendant testified, as follows:

> [DEFENDANT]: So I just kept spraying he dropped it, fell. He fell right here, his hand -- this table was kind-a' right here with the cover over it. [Ms. Sednek] screamed we'll never get [our son] back now. The .38 went under that table. When she screamed out, I reached over and I grabbed the .38 and I left. And that's the truth.

> [DEFENSE COUNSEL]: All right. When you realized you'd shot him, and you reached over and you get your keys and pick up the .38, why didn't you just stay there and call the [p]olice?

> DEFENDANT: I panicked. I wanted the only thing I could think about was she screaming -- we'll never get [our son] back now. He was on my mind anyway. I wanted to -- that's why I ended up missing the turn. I was used to going under the underpass to get to go back towards town, but I was trying to get to Lee Highway from where my son was below the race -- by the Race Track. I sensed things, I was trying to get to him.

Defendant initially told the officers investigating the accident scene that his injuries occurred during the wreck. When asked why he did not tell the officers about the fight and the shooting, Defendant said, "I don't have a good reason. I panicked. I wished I could have sat down calmly and told them. I really do. I wished that I had called 911. I've been told that's why I'm here, I didn't call them. I didn't know, really, I panicked."

The jury found Defendant guilty of first degree premeditated murder, and the trial court imposed a sentence of life. Defendant filed a motion for new trial,[1] which the trial court denied after a hearing, and Defendant timely appealed.

---

[1] Defendant initially filed a pro se motion entitled "Motion for Post-Conviction and Change of Venue." Trial counsel later filed a motion to construe this motion as a motion for new trial. Trial counsel also filed an amended motion for new trial.

## Analysis

On appeal, Defendant argues that: (1) the evidence was insufficient for a rational juror to have found him guilty of first degree premeditated murder beyond a reasonable doubt; (2) the trial court erred by instructing the jury on flight; (3) the trial court erred by failing to give Defendant's requested instruction on spoliation; (4) the trial court erred by admitting evidence of Defendant's prior bad acts; and (5) the trial court erred by failing to order a mistrial when, during deliberations, the jury asked if Defendant had access to their personal information.

### *Sufficiency of the evidence*

Defendant argues that the evidence admitted at trial was insufficient for any rational juror to have found him guilty of first degree premeditated murder because Ms. Sednek's testimony was not credible. He asserts that Ms. Sednek was "a heavy drug user" and was incarcerated when she testified at Defendant's trial. Defendant also notes that Ms. Sednek gave differing versions of the events to police. Additionally, Defendant contends that the evidence was insufficient because he testified that he only fired in self-defense. The State responds that the evidence was sufficient for any rational juror to have found Defendant guilty of premeditated first degree murder beyond a reasonable doubt because "Defendant used a deadly weapon against the unarmed victim" and then fled the scene. The State also argues that the jury resolved all issues of credibility and that the jury "was entitled to reject [D]efendant's theory of self-defense, which rested on his self-serving testimony that the victim was armed when defendant shot him."

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence

and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

## *Self-defense*

Defendant claims that he shot the victim in self-defense. "[W]hether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact." *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997) (citing *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993)). The State must prove beyond a reasonable doubt that the defendant did not act in self-defense. *State v. Sims*, 45 S.W.3d 1, 10 (Tenn. 2001) (citing *State v. Belser*, 945 S.W.2d 776, 782 (Tenn. Crim. App. 1996)).

Tennessee Code Annotated section 39-11-611 provides that

a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

(A) [t]he person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

(B) [t]he danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C) [t]he belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(b)(2)(A)-(C) (2015). A defendant's conduct and mental state must meet an objective standard of reasonableness for the conduct to be justified under these statutory defenses. *State v. Bult*, 989 S.W.2d 730, 732 (Tenn. Crim. App. 1998). Thus, the mere fact that a defendant believes that his conduct is justified would not suffice to justify his conduct. *Id.*

Defendant argues that he had a right to be at the residence and that he reasonably feared harm from the victim because of their prior fight and because, when Defendant reentered the residence, the victim spun around and was holding the .38 caliber pistol. Ms. Sednek testified that the victim was sitting on the couch tying his shoes and was unarmed when Defendant came back inside the residence and shot the victim multiple times. The testimony of CPD Detective Wattenbarger, who investigated the crime scene,

and the testimony Dr. Cogswell, who performed the autopsy of the victim, support Ms. Sednek's testimony that the victim was seated.

Although Ms. Sednek and Defendant gave conflicting testimony as to whether the victim was holding a firearm when Defendant shot him, it was for the jury to decide what testimony they believed and what testimony they did not believe, as well as what weight to give to the testimony. When determining sufficiency of evidence, this court does not re-weigh evidence or replace inferences of the jury. *See State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000).

We conclude that the evidence was sufficient for a rational trier of fact to have found beyond a reasonable doubt that Defendant did not shoot the victim in self-defense.

*Premeditated murder*

Premeditated first degree murder is "[a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1) (2015). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a) (2015). Premeditation "is an act done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Tenn. Code Ann. § 39-13-202(d) (2012). Additionally, "[t]he mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." *Id.* Premeditation "may be established by proof of the circumstances surrounding the killing." *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000). Moreover, there are several factors which tend to support the existence of premeditation, including the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, declarations of an intent to kill by the defendant, evidence of procurement of a weapon, the making of preparations before the killing for the purpose of concealing the crime, and calmness immediately after the killing. *Id.* Whether premeditation is present in a given case is a question of fact to be determined by the jury from all of the circumstances surrounding the killing. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003) (citing *Suttles*, 30 S.W.3d at 261; *State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998)).

Ms. Sednek testified that Defendant was unarmed when he exited the residence after the fight with the victim but that, when Defendant reentered the residence, he shot the unarmed victim who was seated on the couch tying his shoes. Defendant admitted going to his vehicle, getting a .380 pistol, going back inside, and shooting the victim

multiple times. Although Ms. Sednek made a prior inconsistent statement that she did not see who killed the victim, this inconsistent statement was not substantive evidence and could only be considered by the jury for testing Ms. Sednek's credibility. *McFarlin v. State*, 381 S.W.2d 922, 924 (Tenn. 1964). Moreover, Ms. Sednek testified that, as Defendant was leaving the scene of the shooting, he turned around and said, "Twenty-five to life." This conduct indicated some degree of calmness on the part of Defendant immediately after shooting the victim. Additionally, when officers searched Defendant's vehicle, they found various household items, clothing, bedding, a television, and a .380 pistol; from which the jury could infer some level of planning to evade arrest after shooting the victim.

It was within the purview of the jury to credit Ms. Sednek's testimony that she saw Defendant shoot the victim and to discredit Defendant's testimony that he did not plan to shoot the victim and only shot in self-defense. When viewed in the light most favorable to the State, the evidence was sufficient for a rational trier of fact to find Defendant guilty beyond a reasonable doubt of first degree premeditated murder.

### Jury instructions

Defendant claims that the trial court erred by instructing the jury on flight and by refusing to instruct the jury on the State's duty to preserve evidence.

A defendant has "a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Farner*, 66 S.W.3d 188, 204 (Tenn. 2001). A charge that fails to "fairly submit the legal issues" to the jury or that "misleads the jury as to the applicable law" is erroneous. *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997). Whether jury instructions are sufficient is a question of law, which we review de novo with no presumption of correctness. *State v. Clark*, 452 S.W.3d 268, 295 (Tenn. 2014).

### Flight instruction

Defendant argues that the trial court erred by instructing the jury on flight because he "did not leave to hide or flee the jurisdiction[,] rather he left to see his child, fearful that because of the incident, he would not be able to see him again." Defendant also notes that he did not leave the scene of his car wreck.

The State responds that the trial court properly instructed the jury on flight. The State also asserts that this issue is waived because Defendant failed to properly support his argument with citation to authority. Although Defendant failed to cite authority specifically concerning flight, Defendant did cite *Taylor v State*, 369 S.W.2d 385 (1963),

for the general proposition that "judges are required to make affirmative instructions on every issue raised by the proof in a case[.]" We choose to address the issue on the merits.

"In order for a trial court to charge the jury on flight as an inference of guilt, there must be sufficient evidence to support such instruction." *State v. Berry*, 141 S.W.3d 549, 588 (Tenn. 2004). Based on the State's written request and over Defendant's objection, the court instructed the jury using the pattern instruction, 7 T.P.I.—42.18:

> The flight of a person accused of a crime is a circumstance which, when considered together with all the facts of the case, may justify an inference of guilt. Flight is the voluntary withdrawal of oneself for the purpose of evading arrest or prosecution for the crime charged. Whether the evidence presented proves beyond a reasonable doubt that the defendant fled is a question for your determination.

> The law makes no nice or refined distinction as to the manner or method of a flight; it may be open, or it may be a concealment within the jurisdiction. However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown, to constitute flight.

> If flight is proved, the fact of flight alone does not allow you to find that the defendant is guilty of the crime alleged. However, since flight by a defendant may be caused by a consciousness of guilt, you may consider the fact of flight, if flight is so proven, together with all of the other evidence when you decide the guilt or innocence of the defendant. On the other hand, an entirely innocent person may take flight and such flight may be explained by proof offered, or by the facts and circumstances of the case.

> Whether there was flight by the defendant, the reasons for it, and the weight to be given to it, are questions for you to determine.

In *Jones v. State*, this court stated:

> It is universally recognized that testimony as to flight, attempted flight, or concealment after the commission of an offense or after one is accused of a crime is relevant evidence which may be shown as a criminating circumstance, particularly where such conduct is apparently inconsistent with the idea of innocence.

- 12 -

*Jones v. State*, 580 S.W.2d 329, 332 (Tenn. Crim. App. 1978) (citing 22A C.J.S. Criminal Law s 625 (1961)).

The evidence in this case showed that, immediately after shooting the victim five times, Defendant pointed his pistol at Ms. Sednek and said, "Twenty-five to life." Defendant then immediately left the scene in his vehicle. Because Defendant wrecked his vehicle before reaching his ultimate destination or completing his plan of action, there is no direct evidence that Defendant planned to hide out, conceal himself in the community, or leave the community for parts unknown. There was, however, circumstantial evidence that Defendant planned to evade police. Officer Warner testified that he believed Defendant tried to flee from the scene of the wreck because there were tire tracks in the mud around Defendant's vehicle. Defendant lied to the police about the cause of his injuries, claiming that he received them in the wreck rather than telling the officers about the fight with the victim and about the shooting. During the search of Defendant's vehicle, various household items, clothing, and bedding were discovered.

There was sufficient evidence for the trial court to instruct the jury on flight, and the trial court properly instructed the jury that it was for the jury to determine whether there was flight by Defendant, the reasons for it, and the weight to be given to it.

### *Jury instruction on spoliation of evidence*

Defendant contends that the trial court erred by denying his oral request for a jury instruction on spoliation of evidence because Defendant sent multiple pro se requests for fingerprint testing of evidence, and the TBI failed to conduct the tests. In his brief, Defendant asserts that "[t]he failure to give this charge clearly gutted [his] self[-]defense claim." The State responds that this issue is waived because Defendant failed to submit a written request for this instruction at trial. The State additionally contends that Defendant is not entitled to plain error relief on this issue because "the record does not clearly establish what occurred in the trial court, and [D]efendant cannot show the breach of a clear and unequivocal rule of law."

Although Defendant orally requested the instruction during trial, Defendant did not submit a written request for a pattern instruction on the State's duty to preserve evidence, 7 T.P.I.-42.23, or inference of concealment or destruction of evidence, 7 T.P.I.-42.27, or a special request for an instruction on spoliation. *See State v. Mackey*, 638 S.W.2d 830, 836 (Tenn. Crim. App. 1982) (stating that Tennessee Rule of Criminal Procedure Rule 30(a) "envisions that such requests be made in writing" and an oral request for a jury instruction is not sufficient for an appellate court to find that a trial court erred by refusing to give the instruction.) An appellate court may consider a request for jury instruction waived when not made in writing. *See State v. Clois Dean*

*Asbury*, No. E2011-00431-CCA-R3-CD, 2012 WL 4459819, at *12 (Tenn. Crim. App. Sept. 27, 2012), *no perm. app. filed*; *see also State v. Vickers*, 985 S.W.2d 1, 8 (Tenn. Crim. App. 1997).

We note that because the State requested the TBI to test the pistol for DNA evidence rather than fingerprints, there was no fingerprint evidence to preserve. Concerning Defendant's claimed error related to failure to give a jury instruction on the State's duty to preserve fingerprint evidence, the trial court noted in denying the Defendant's motion for new trial:

> This is not lost evidence. A [*State v.*] *Ferguson* [2 S.W.3d 912 (Tenn. 1999] hearing was held, the proper factors explored, and the [c]ourt ruled that the forensic witnesses could be fully examined on the lack of fingerprint evidence, but that since it never existed, the State had no duty to preserve it. A defense motion for independent testing was withdrawn.

We conclude that Defendant has waived review of this issue because Defendant failed to submit a written request for the instruction at trial. *See* Tenn. R. Crim. P. 30(a); *State v. Leath*, 461 S.W.3d 73, 107 (Tenn. Crim. App. 2013). We also find that Defendant waived the issue by failing to cite any authority supporting this issue. *See* Tenn. R. Ct. Crim. App. 10(b).

### *Admission of evidence of prior bad acts*

Defendant contends that the trial court erred in allowing Ms. Sednek to testify regarding prior bad acts of Defendant because "the proof from Ms. Sednek was not convincing" and because "the alleged incidents had nothing to do with Defendant's propensity for violence against another." Defendant cites to *State v. Gilliland*, 22 S.W.3d 266 (Tenn. 2000), in support of his argument that the trial court "abused its discretion in admitting evidence of involvement in a prior shooting where the evidence was of small probative value and the slight value was clearly outweighed by undue prejudice."

The State responds that the trial court properly admitted the evidence because "that evidence provided essential context explaining the complete story of the murder." The State argues that "without the evidence of Defendant's prior assault of Ms. Sednek, there would have been a chronological or conceptual void in the State's presentation of the case." The State asserts that "[t]he ensuing fight between Defendant and the victim supplied Defendant's motive to shoot the victim." Additionally, the State asserts that the trial court "substantially complied" with the requirements of Tennessee Rule of Evidence

404(b). Further, the State contends that omission of this evidence "would have confused the jury as to material issues surrounding [D]efendant's theory of self-defense."

Generally, this court reviews a trial court's decision to admit evidence based upon its relevancy under an abuse of discretion standard. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997). Likewise, when such evidence is offered under Tennessee Rule of Evidence 404(b) and the trial court has "substantially complied" with the procedural requirements in that rule, we review the trial court's decision under an abuse of discretion standard. *Id.* We will reverse the trial court's decision "only when the court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *Gilliland*, 22 S.W.3d at 270 (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)) (internal quotation marks omitted).

Rule 404(b) of the Tennessee Rules of Evidence provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b); *see also State v. Thacker*, 164 S.W.3d 208, 240 (Tenn. 2005); *State v. Parton*, 694 S.W.2d 299, 302 (Tenn. 1985). Rule 404(b) is generally one of exclusion, but exceptions to the rule may occur when the evidence of the otherwise inadmissible conduct is offered to prove the motive of the defendant, identity, intent, the absence of mistake or accident, opportunity, or a common scheme or plan. *State v. Toliver*, 117 S.W.3d 216, 230 (Tenn. 2003); *State v. McCary*, 119 S.W.3d 226, 243

- 15 -

(Tenn. Crim. App. 2003). "In addition to these exceptions, evidence of other acts may be admitted to provide the jury with necessary contextual background." *State v. Montgomery*, 350 S.W.3d 573, 583 (Tenn. Crim. App. 2011) (citing *Gilliland*, 22 S.W.3d at 272); *see also* Neil P. Cohen et al., *Tennessee Law of Evidence* § 4.04[13] (6th ed. 2011) (evidence admissible to tell the "complete story").

If the trial court substantially complies with the procedural requirements of Rule 404(b), we will review the trial court's determination for an abuse of discretion. *Thacker*, 164 S.W.3d at 240 (citing *DuBose*, 953 S.W.2d at 652; *State v. Baker*, 785 S.W.2d 132, 134 (Tenn. Crim. App. 1990)). However, if the trial court fails to substantially comply with the requirements of the rule, then the trial court's decision should be afforded no deference by the reviewing court. *DuBose*, 953 S.W.2d at 652.

The trial court conducted a 404(b) hearing outside of the jury's presence and found that Ms. Sednek's testimony contributed to the material issues of the complete story of the crime, Defendant's intent, and the victim's state of mind. The trial court found the evidence to be clear and convincing and weighed the probative value against the danger of unfair prejudice. The trial court found that the probative value of Ms. Sednek's testimony outweighed the danger of unfair prejudice. We conclude the trial court substantially complied with the Rule 404(b)'s procedural requirements, and we will review the trial court's decision for abuse of discretion. *Thacker*, 164 S.W.3d at 240 (citing *DuBose*, 953 S.W.2d at 652); *Baker*, 785 S.W.2d at 134.

We agree with the State that the evidence was necessary to provide a contextual background to the case and was admissible to explain why the victim started a physical altercation with Defendant. The victim had been told to leave the residence due to Defendant and Ms. Sednek's arguing, and Defendant became angry when he realized Ms. Sednek allowed the victim back into the residence. Ms. Sednek told the victim of Defendant's vandalism and threats toward her, and the victim "aggressively defended" Ms. Sednek. By omitting Ms. Sednek's testimony, the jury would have been confused as to material issues surrounding the altercation that ensued between Defendant and the victim. Accordingly, the trial court acted within its discretion in admitting testimony about these incidents into evidence.

### *Mistrial*

Defendant asserts that the trial court erred by failing to order a mistrial when, during deliberation, the jury passed a note to the trial court asking whether Defendant had access to their personal information. He argues that the trial court failed to preserve the note and failed to record the parties' discussion about the note and the court's ruling. Defendant contends that the jury's question showed that the jury was prejudiced against

him, and thus, a fair trial was impossible. The State responds that Defendant has waived plenary review of this issue because Defendant did not contemporaneously request a mistrial during jury deliberations; that the record is inadequate for this court's review; and that Defendant failed to support his argument with citations to authority. The State also argues that Defendant is not entitled to plain error relief because the record does not clearly establish what occurred in the trial court and Defendant has not established that the trial court breached a clear and unequivocal rule of law by failing to declare a mistrial.

Tennessee Rule of Appellate Procedure 36(a) states that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." As stated in the trial court's order denying Defendant's motion for a new trial, Defendant did not request a mistrial when the jury asked the court if Defendant would have their personal information. Defendant waived plenary review of this issue by failing to contemporaneously request a mistrial. In any event, we will discuss whether plain error relief is warranted.

Normally, a mistrial should be declared only in the event that a manifest necessity requires such action. *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). "In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did." *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000). The burden to show the necessity for a mistrial falls upon the party seeking the mistrial. *Id.*

In this case, Defendant has failed to demonstrate that the trial court committed plain error. The trial court did not breach a clear and unequivocal rule of law by its response to the jury's question. *See State v. Adkisson*, 899 S.W.2d 626, 641 (Tenn. Crim. App. 1994). Plain error relief is "limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *Id.* at 642. The jury's question was not related to the law or evidence, and once the question was received, the trial court gave the following instruction to the jury: "You must render your verdict with absolute fairness and impartiality as you think justice and truth dictate." The jury is presumed to have followed the trial court's instructions. *State v. Banks*, 271 S.W.3d 90, 137 (Tenn. 2008). Additionally, in its order denying Defendant's motion for new trial, the trial court stated that it "received the question and discussed it with the parties." The trial court formulated a response to the question and communicated that response to the jury. We find no plain error in the trial court utilizing a curative instruction instead of declaring a mistrial.

## Conclusion

After reviewing the facts and applicable case law, we affirm the judgment of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE